UNITED STATES v. NEWARK MEADOWS IMP. CO. et al.

(Circuit Court, S. D. New York. October 15, 1909.)

1. CRIMINAL LAW (§ 97*)—JURISDICTION—LOCALITY OF OFFENSE—CRIMES AGAINST UNITED STATES.

A point on the waters of the ocean within a marine league of the coast of New Jersey is within the state by Act N. J. May 17, 1906 (P. L. p. 542), and therefore within the federal district of New Jersey; and under Const. U. S. art. 3, § 2, and the sixth amendment, a criminal offense against the laws of the United States committed at such point can only be prosecuted in that district.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 177–191; Dec. Dig. § 97.*]

2. CRIMINAL LAW (§ 97*)—JURISDICTION—LOCALITY OF OFFENSE—HARBORS—DEPOSITS OF REFUSE—FEDERAL STATUTE.

Under Act June 29, 1888, c. 496, 25 Stat. 209, as amended by Act Aug. 18, 1894, c. 299, § 3, 28 Stat. 360 (U. S. Comp. St. 1901, p. 3534), which makes it a criminal offense to dump refuse in the tidal waters of New York Harbor within prescribed limits, or to deviate from the dumping grounds specified in a permit granted thereunder, an offense is not committed until refuse is dumped in some prohibited place, and such place fixes the locus of the crime and the venue for its prosecution.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 177–191; Dec. Dig. § 97.*]

3. STATES (§ 12*)—BOUNDARIES—EXTENSION INTO OCEAN WATERS.

A state bordering on the sea may, in the exercise of its sovereignty, extend its own borders for the distance of one marine league from low-water mark, and make the region so annexed as much a portion of the state as any other part of its territory.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. § 12.*]

4. WORDS AND PHRASES—"MAIN SEA"—"HIGH SEA."

"Main sea" and "high sea" are synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 4277; vol. 4, pp. 3287, 3289.]

5. WORDS AND PHRASES—"HIGH SEAS."

The term "high seas" includes waters on the seacoast and without the boundaries of low-water mark.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Demurrer to an indictment of the Newark Meadows Improvement Company and others for illegally dumping "two pockets of mud" into the "tidal waters of the lower bay of the New York Harbor and its adjacent waters" at a place 2¼ miles from the Sandy Hook shore and one-quarter of a mile east-southeast of the inner South Channel Buoy. Demurrer sustained.

William S. Ball, Asst. U. S. Atty.

Thomas D. Thacher, for defendants.

HOUGH, District Judge. This indictment is framed under Act June 29, 1888, c. 496, 25 Stat. 209, and Act Aug. 18, 1894, c. 299, § 3, 28 Stat. 360 (U. S. Comp. St. 1901, p. 3534), and the place of dumping accurately specified, confessedly in order to test on demurrer the jurisdiction of this court. Said place so described is within a marine league of that portion of the coast of New Jersey known as Sandy Hook. The point on Sandy Hook nearest the dumping place is within the national military reservation containing Ft. Hancock. Admittedly, however, the cession of Sandy Hook by New Jersey to the United States does not prevent such military reservation from being within and territorially a portion of the state of New Jersey. Hamburg-American S. S. Co. v. Grube, 196 U. S. 407, 25 Sup. Ct. 352, 49 L. Ed. 529; Middleton v. Compagnie Générale, 100 Fed. 866, 41 C. C. A. 98. Cf. Beekman v. Railroad Co. (C. C.) 35 Fed. 3.

The demurrer, therefore, asserts that this indictment lays the crime as committed within the territorial limits of the state of New Jersey, and therefore of the district of New Jersey (Rev. St. § 531 [U. S. Comp. St. 1901, p. 316]), from which it follows that this criminal prosecution must not be brought in New York, but before "an impartial jury of the * * * district wherein the crime" was committed (Const. Amend. 6; also article 3, § 2), viz., the district of New Jersey. Most shortly stated, therefore, the question presented is whether a point on the waters of the ocean within a marine league of the coast of New Jersey is within that state, and consequently that federal district.

Under the statutes authorizing this prosecution, it has been suggested (though not urged in this case) that the crime consists in the "deviation" from the dumping or discharging place specified in the permit issued by the supervisor of New York Harbor. Act Aug. 17, 1894, Supp. Rev. St. (2d Ed.) p. 249. But this act must be read in conjunction with the earlier act of June 29, 1888, supra; and from that statute it appears to me to be plain that the crime set forth in this indictment is not only not complete, but is not committed, until forbidden matter shall have been "placed, discharged or deposited" in the "tidal waters of the harbor of New York or its adjacent or tributary waters." The crime is committed where the scow is dumped.

It might also be attempted to draw a distinction between a point on the surface of the ocean and the land under water at the same point. Without considering whether any such distinction can be drawn under accepted doctrines of international law, it seems entirely clear that these statutes proscribe as a crime the "placing, discharging or deposit-

ing" of forbidden matter in tidal waters, and it is therefore quite immaterial whether by action of tide or current the unlawfully discharged matter is, before reaching bottom, carried to a place not within the waters described in the act.

The indictment alleges that the Southern district of New York is the one in which defendants herein "were found and into which they were first brought and apprehended for the offense" charged. This means that Rev. St. § 730 (U. S. Comp. St. 1901, p. 585), is deemed applicable, and involves the assertion that the offense here charged was committed "upon the high seas or elsewhere out of the jurisdiction of any particular state or district."

It is not denied that, in so far as it is competent for the state of New Jersey to embrace within its territorial limits a marine league of ocean, such annexation of territory has taken place. Act N. J. May 17, 1906 (P. L. p. 542). By this statute the place described in the indictment is clearly within not only the state of New Jersey, but also within the county of which Sandy Hook is a part.

For some purposes, however, the point or place in the indictment set out is within the harbor of New York; that is, within the line from Navesink Lighthouse to Scotland Light, thence to the Whistling Buoy in Gedney's Channel, and thence to Rockaway Point, prescribed by the Secretary of the Treasury as the limits of the waters of the harbor of New York pursuant to Act Feb. 19, 1895, c. 102, 28 Stat. 672, Supp. Rev. St. (2d Ed.) p. 381 (U. S. Comp. St. 1901, p. 2899). This legislation, however, was for the purpose of delimiting the inland waters of the United States, in order to inform navigators where the inland rules of navigation, as distinguished from the international rules, become applicable. It does not purport to change the boundaries of any federal district, nor enlarge the jurisdiction of any particular federal court; and it is obviously beyond the power of Congress directly or indirectly to enlarge or narrow the territorial limits of New Jersey.

By convention between New York and New Jersey the boundary line between the states runs "through the center of Raritan Bay to a point between Sandy Hook and Coney Island, as the same is shown on a map filed with the Secretary of State and dated October 12, 1877, thence easterly to the main sea." Consol. Laws N. Y. c. 57, § 7. As this line is dictinctly north of the dumping place specified in the indictment, it is not contended that the dumping occurred within the territorial jurisdiction of the state of New York, or any federal district thereof. But the curious condition exists that by convention or agreement between New York and New Jersey the boundary line between them terminates at the "main sea," yet "main sea" and "high sea" are synonymous (United States v. Grush, 26 Fed. Cas. 48; Johnson v. 21 Bales, 13 Fed. Cas. 855; United States v. Smith, 27 Fed. Cas. 1166); and "high seas" include waters on the seacoast without the boundaries of low-water mark (De Lovio v. Boit, 7 Fed. Cas. 428; United States v. Ross, 27 Fed. Cas. 899).

It follows that New Jersey has by the act above referred to extended (or declared) its boundaries so as to include therein a space one marine league in width beyond the point at which, when convention was made

with New York, its territory terminated or was thought to terminate. Can this lawfully be done? In McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248, it was held that each state owns the bed of all tide waters within its jurisdiction, and that similarly the states own the tide waters themselves. In Manchester v. Massachusetts, 139 U. S. 240, 258, 11 Sup. Ct. 559, 562, 35 L. Ed. 159, the court citing the case just referred to, declared that it must be regarded as established that as between nations the minimum limit of the territorial jurisdiction of a nation over tide waters is a marine league from its coast. Both from the language quoted and from the nature of the decision in the Manchester Case, it seems to me to follow that New Jersey may, in the exercise of its sovereignty, extend its own borders for the space of one marine league from low-water mark and make the region so annexed as much a portion of the state as any other part of its territory.

That the territorial jurisdiction of the United States extended a marine league from the coast of New Jersey was asserted by the trial court and approved by the Supreme Court in Wiborg v. United States, 163 U. S. 632, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289. (It is curious to note that this holding was made and approved before the New Jersey act of 1906.) The existence of territorial jurisdiction (which must imply territorial ownership) is also asserted under various circumstances in the following cases: Bigelow v. Nickerson, 70 Fed. 113, 17 C. C. A. 1, 30 L. R. A. 336; United States v. Smiley, 6 Sawy. 640, Fed. Cas. No. 16,317; The Ann, 1 Call. 62, Fed. Cas. No. 397; Humboldt Lumber Mfg. Ass'n v. Christopherson, 73 Fed. 239, 19 C. C. A. 481, 46 L. R. A. 264.

It seems to me to follow, from the rulings and statutes cited, that the state of New Jersey may extend and has extended its limits to and beyond the place where the alleged crime was committed. That place is on the high seas, or the main sea; but (entirely apart from constitutional provisions) that fact alone is not enough to render applicable Rev. St. § 730, for under that act, in order to give this court jurisdiction under the circumstances shown, the offense must have been committed, not only upon the high seas, but "out of the jurisdiction of any particular state or district." But, if that portion of the high seas which lies within a marine league of a nation's coast may be territorially appropriated by such nation, then such portion is within a "particular state or district."

This conclusion does not lessen or interfere with the national jurisdiction in admiralty. Admiralty causes may be promoted wherever the res or respondent is found and seized or served. A remedy in admiralty might have been given for the offense of illegal dumping; but this proceeding has no relation to admiralty. It is strictly criminal, and the place where the crime was committed governs jurisdiction. This alleged crime was committed in New Jersey.

Demurrer sustained.